Filed 10/23/17 (unmodified opn. attached)

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>    **Plaintiff and Respondent,**<br><br>**v.**<br><br>**DARRELL ELLIS MOORING, JR., et al.,**<br><br>    **Defendants and Appellants.** | **A143470**<br><br>**(Contra Costa County Super. Ct. No. 51214204)**<br><br>**ORDER MODIFYING OPINION AND DENYING REHEARING [NO CHANGE IN JUDGMENT]** |

**THE COURT:**

Appellants' October 11, 2017 petition for rehearing is denied. The opinion is modified as follows:

1.    On page 2, in the first sentence of the second full paragraph, insert the word "compilation" to state:

"We conclude the Ident-A-Drug Web site comes within the published compilation exception to the hearsay rule set forth in Evidence Code section 1340, and that defendants' confrontation clause claim fails because the challenged hearsay is not testimonial."

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, IV and V.

1

2. On page 6, in the second sentence of the first full paragraph, the phrase "spend two years in jail" is deleted and the phrase "serve a one-year jail term" is inserted in its place to read:

"The court placed Davis on five years' probation, with the condition she serve a one-year jail term."

3. On page 20, in the first sentence of the second paragraph under Section III.A, insert the word "always" to state:

"As defendants acknowledge, chemical analysis is not always required to establish the identity of a controlled substance."

This modification does not change the judgment.


Dated: October 23, 2017           _____

                             Jones, P. J.

A143470

**CERTIFIED FOR PARTIAL PUBLICATION**[*]

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| **THE PEOPLE,**<br><br>    **Plaintiff and Respondent,**<br><br>**v.**<br><br>**DARRELL ELLIS MOORING, JR., et al.,**<br><br>    **Defendants and Appellants.** | **A143470**<br><br>**(Contra Costa County<br>Super. Ct. No. 51214204)** |

In 2011, law enforcement officers searched the home of Lanita Denise Davis and Darrell James Mooring, (Mooring, Sr.) and found over 4,000 prescription pills, many of which were in prescription pill bottles. Davis and Mooring Sr.'s names were on some pill bottle labels; other labels bore the name of their son, Darrell Ellis Mooring Jr. (Darrell). Using Ident-A-Drug, a subscription-based, login-controlled Web site, the prosecution's criminalist presumptively identified the pills as various controlled substances.

A jury convicted Davis and Darrell (collectively, defendants) of five counts of possessing a controlled substance for sale (Health & Saf. Code, § 11351 (dihydrocodeinone/Vicodin, codeine, morphine, methadone, and oxycodone))[1] and one count of possessing a designated controlled substance for sale (§ 11375, subd. (b)(1)

---

[*] Pursuant to California Rules of Court, rules 8.1105(b) and 8.1110, this opinion is certified for publication with the exception of parts I, IV and V.

[1] All undesignated statutory references are to the Health and Safety Code. We refer to Darrell by his first name for clarity.

1

(diazepam)).  The court placed Davis on probation, with the condition she spend two years in jail.  The trial court found Darrell's prior convictions true, denied his motion to strike those convictions (*People v. Superior Court* (*Romero*) (1996) 13 Cal.4th 497 (*Romero*)), and sentenced him to 10 years in state prison.

Defendants appeal, and join each other's briefs.  They contend: (1) the court erred by admitting statements Davis made to police in 2003; (2) the criminalist's testimony regarding the content of the Ident-A-Drug Web site was inadmissible hearsay, and its admission violated state hearsay law and their confrontation rights under the Sixth Amendment to the federal constitution; and (3) the prosecution failed to prove they possessed the controlled substances.  Darrell claims the court erred by imposing an enhancement for a prior drug-related conviction (§ 11370.2, subd. (a)), and by denying his *Romero* motion.

We conclude the Ident-A-Drug Web site comes within the published exception to the hearsay rule set forth in Evidence Code section 1340, and that defendants' confrontation clause claim fails because the challenged hearsay is not testimonial.  We agree with defendants that the prosecution did not establish dihydrocodeinone/Vicodin is a controlled substance under sections 11055 or 11056 and, as a result, defendants' conviction for possessing a controlled substance for sale (§ 11351 (Count One)) must be reversed and the cause remanded for resentencing.  In all other respects, we affirm.

FACTUAL AND PROCEDURAL BACKGROUND

An indictment charged defendants with possessing dihydrocodeinone, a controlled substance, for sale (§ 11351 (Count One)); possessing diazepam, a designated controlled substance, for sale (§ 11375, subd. (b)(1) (Count Two)); possessing codeine, a controlled substance, for sale (§ 11351 (Count Three)); possessing morphine, a controlled substance, for sale (§ 11351 (Count Four)); possessing methadone, a controlled substance, for sale (§ 11351 (Count Five)); and possessing oxycodone, a controlled substance, for sale (§ 11351 (Count Six)).  The indictment alleged sentencing enhancements for Darrell's two prior drug-related convictions (§ 11370.2, subd. (a)), and his prior serious felony conviction (Pen. Code, §§ 667, subds. (b)-(i), 1170.12).

2

*Prosecution Evidence*

In January 2011, Richmond Police Sergeant Eduardo Soto was assigned to the narcotics unit. He had significant experience investigating suspected narcotics sales. As Soto was preparing to execute a search warrant at Davis and Mooring Sr.'s house, he saw a woman park her car outside the house. She went inside the house for a minute, came back outside, and drove away. Later, another person parked outside the house, went inside, came out about a minute later, and left. Soto believed narcotics were being sold in the house.

Law enforcement officers knocked on the front door of the house and Mooring, Sr. answered. Inside the house, officers found mail belonging to "Darrell Mooring" and Davis. They also found over 4,000 prescription pills. Some pills were in prescription pill bottles with labels bearing the names "Lanita Davis," "Darrell Mooring," "Darrell Mooring, Sr." and "Darrell Mooring, Jr."[2] Other pill bottles had no label. In the master bedroom, officers found between 35 and 40 prescription pill bottles. Some bottles contained pills; others were empty. Officers also found a police scanner.

Darrell arrived while the officers searched the house. The officers gave Darrell a property receipt for the seized items. Later that day, Darrell came to the police station and asked for "his pills . . . that [had been] taken" from the residence. When the police officer refused to return the pills, Darrell became angry.

A. Expert Testimony

Shana Meldrum, a criminalist at the Contra Costa Sheriff's Crime Lab (crime lab) testified as an expert in presumptive identification of prescription pills. She had 10 years of experience as a criminalist, and over 400 hours of training in analyzing and identifying suspected controlled substances. Meldrum received training on the references the crime lab uses to presumptively identify prescription pills. The crime lab uses a reference—the

---

[2]    Soto booked several pill bottles into evidence, including: (1) one prescribed to "Mooring, Darrell" and containing methadone; (2) one prescribed to "Lanita Davis" and containing hydrocodone; and (3) one prescribed to "Darrell Mooring, Jr." and containing hydrocodone.

Ident-A-Drug Web site—to presumptively identify pharmaceutical pills. The Web site contains information about, and images of, pharmaceutical pills derived from the FDA and pharmaceutical pill manufacturers.[3] The crime lab pays a subscription fee to access Ident-A-Drug, and the Web site is login-controlled.

To presumptively identify a prescription pill, the crime lab compares the pill's "individual characteristics"—its color, shape, and markings—to images on Ident-A-Drug. Meldrum explained: "I type the markings on the pill into the website and it gives me either one match or a list of possible matches that the pill may be. And based on the color and the shape and the imprints on the pill, I make a determination as to whether or not to report that out as a presumptive identification." This method is generally accepted in the scientific community, and has been reviewed by the crime lab's accrediting board.[4] Meldrum has presumptively identified prescription pills using Ident-A-Drug over 2,000 times.

Meldrum compared the markings, imprints, coloring, and shapes of the prescription pills seized from the residence to the information on Ident-A-Drug. Meldrum presumptively identified the pills as follows: (1) 1,930 dihydrocodeinone (or Vicodin), a controlled substance;[5] (2) 573 oxycodone, a controlled substance; (3) 132 diazepam, a controlled substance; (4) 785 methadone, a controlled substance; (5) 242 morphine, a controlled substance; and (6) 113 codeine, a controlled substance. Meldrum did not conduct chemical testing on the pills. A usable amount of a prescription pill "may be as . . . little as half a pill." Meldrum did not think the pills were counterfeit. Counterfeit pills are "a softer texture than a legal pharmaceutical" and may have a "slightly different color."

---

[3] Prescription pill manufacturers register a pill's markings, color, and shape with the Food and Drug Administration (FDA). The Ident-A-Drug Web site is located at: <http://identadrug.therapeuticresearch.com> (as of Sept. 27, 2017).

[4] A similar method of identifying a prescription pill is comparing the pill's marking to images in the Physicians' Desk Reference, an encyclopedia of drugs.

[5] Dihydrocodeinone is an opiate-based drug; its "common name" is Vicodin.

4

Richmond Police Sergeant Tim Simmons testified as an expert on possessing prescription pills for sale. Simmons reviewed defendants' prescription records from 2009 to 2011, which showed they obtained the "maximum allowable" number of certain opiate-based drugs and muscle relaxers every month. Some prescriptions were billed to an insurance carrier; others were paid for in cash. Simmons opined defendants possessed the pills for sale based on: (1) the quantities for each individual drug, which were beyond what defendants could have safely ingested; (2) the frequency with which defendants filled prescriptions; (3) irregularities in the billing and payment for the prescriptions; and (4) the police scanner found in the house.

B.     The 2003 Incident at Davis's Home

In 2003, Richmond Police Detective Darren Monahan executed a search warrant at Davis's house. Davis was handcuffed. In a bedroom, Monahan found a large amount of cash and prescription pill bottles containing 134 pills. The names on the prescription labels did not match the names of anyone in the house. When Monahan asked Davis "who the prescription pills belonged to," she responded "they belonged to her." Monahan *Mirandized* Davis and asked her why she had the prescription pills. Davis said "she gets them from various people and then resells them for extra money." No charges were filed against Davis based on the 2003 incident.

With regard to the evidence of the 2003 incident, the court admonished the jury: "with respect to any statement allegedly made by Ms. Davis, if, in fact, it is believed by you, it is solely to be used in evaluating whether or not Ms. Davis is guilty or not guilty of the charges. It is not to be used in any way in evaluating whether or not [Darrell] is guilty or not guilty of the charges."

*Defense Evidence*

In 2010 and 2011, Dr. Nishant Shah prescribed methadone to Mooring, Sr. Darrell was a patient of Dr. Edward Manougian from 2008 to 2011. In 2009 and 2010, Darrell had chronic pain syndrome. Dr. Manougian prescribed Darrell up to 800 pills a month, comprised of Vicodin, OxyContin, a muscle relaxant, and Valium. During that same time period, Dr. Manougian also treated Davis for "chronic pain." In January 2011,

5

he prescribed Davis hundreds of prescription pills, including oxycodone, Valium, and a Vicodin-like drug. Dr. Manougian believed defendants were using the prescribed pills, not selling them. In 2007, certain pharmacies stopped filling Dr. Manougian's prescriptions. In 2012, Dr. Manougian's medical license was revoked in part because he had "not engaged in any formal course of study" regarding "treatment of pain or pain management" and had no "special training or experience in addiction."

*Verdict and Sentencing*

The jury convicted defendants of the charges. The court placed Davis on five years' probation, with the condition she spend two years in jail. The court found true the allegations regarding Darrell's prior convictions and denied his *Romero* motion. The court sentenced him to 10 years in state prison, comprised of the following: four years on Count One (§ 11351); and two three-year enhancements (§ 11370.2, subd. (a)).

DISCUSSION

I.

*Defendants' Claims Regarding the Admission of Davis's*
*2003 Statements to Police Fail*

Defendants contend the court erroneously admitted statements Davis made to police in 2003, when officers executed a search warrant at her home.

A.      Background

Before trial, defendants moved to suppress Davis's 2003 statements to Monahan. They argued the statements were "involuntary" because they were the product of a constitutionally defective search, and because Davis was not "on notice" she might be implicating herself when she spoke. Defendants also claimed the statements were irrelevant and unduly prejudicial, and that admitting the statements violated *Aranda-Bruton* (*People v. Aranda* (1965) 63 Cal.2d 518; *Bruton v. United States* (1968) 391 U.S. 123).

At the suppression hearing, Monahan testified he and other officers executed a search warrant at Davis's residence in March 2003. Some officers remained outside the house; other officers knocked on the door. A man opened the door and allowed the

6

police to enter. Davis was one of five or six people inside the house. The officers handcuffed the occupants for officer safety.

A few minutes later, Monahan took Davis into the kitchen and told her he had a warrant to search the house for cocaine base. The officers searched Davis's bedroom for about 15 minutes and found cocaine pipes and prescription pill bottles bearing names that did not match the house's occupants. Monahan returned to the kitchen and spoke with Davis at the kitchen table. He did not draw or display any weapons. Monahan asked Davis "who the prescription pills belonged to." Davis said the pills were hers. Then Monahan read Davis her *Miranda* rights. Davis indicated she understood those rights and told Monahan she acquired prescription pills from different people and sold them to make extra money. Davis said she also sold cocaine base, but was out of it that day. Monahan booked the prescription pills into evidence. No charges were filed against Davis.

The court denied the suppression motion. It determined Davis's statements were voluntary and that she was properly *Mirandized* before "a fuller statement [was] taken." The court found the evidence was "relevant. Given the nature of the charges, it does in fact, fall within [Evidence Code section] 1101 with respect to intent." Additionally, the court exercised its discretion under Evidence Code section 352 "in favor of the prosecution."

At trial, Monahan testified about the 2003 incident, specifically that he asked Davis "who the prescription pills belonged to," and she responded "they belonged to her." When Monahan asked Davis why she had the pills, Davis said she got "them from various people and then resells them for extra money."

B.    Any Assumed *Miranda* Violation Is Harmless Beyond a Reasonable Doubt

Defendants claim Davis's statements should have been excluded because they were obtained in violation of *Miranda*. According to defendants: (1) Monahan interrogated Davis while she was in custody, and before *Mirandizing* her; (2) Monahan circumvented *Miranda* requirements by using an improper two-step interrogation technique; and (3) the statement Davis made after being *Mirandized*—that she acquired

7

prescription pills from different people and sold them for extra money—was tainted by her first statement that the pills belonged to her.

We address the merits of Davis's *Miranda* argument to obviate an ineffective assistance of counsel claim.[6] (*People v. Scaffidi* (1992) 11 Cal.App.4th 145.) "We apply a de novo standard of review to a trial court's denial of a motion to suppress . . . under *Miranda* insofar as the trial court's underlying decision entails a measurement of [as here] undisputed facts against the law." (*People v. Riva* (2003) 112 Cal.App.4th 981, 988, fn. omitted.) *Miranda* advisements are required only when a person is subjected to custodial interrogation. "An interrogation is custodial when 'a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' " (*People v. Kopatz* (2015) 61 Cal.4th 62, 80.)

We assume for the sake of argument Davis was subjected to a custodial interrogation when Monahan questioned her, and that the admission of her incriminatory statements violated *Miranda*. We conclude, however, that any assumed error is harmless beyond a reasonable doubt. The court admitted Davis's statements to demonstrate her intent to sell the prescription pills. (See Evid. Code, § 1101, subd. (b); *People v. Ewoldt* (1994) 7 Cal.4th 380, 393, fn. 1 (*Ewoldt*), superseded by statute on other grounds as stated in *People v. Britt* (2002) 104 Cal.App.4th 500, 505.) But other, overwhelming evidence independently demonstrated Davis's intent to sell the drugs, including: (1) the huge volume of the pills; (2) the frequency with which defendants filled prescriptions; (3) the irregular method of paying for the prescriptions; (4) the police scanner; (5) the

---

[6]     Darrell has no standing raise a claim based on the alleged violation of Davis's *Miranda* rights because the evidence was admitted only against Davis. "[D]efendants must allege a violation of their *own* rights . . . to have standing to argue that testimony of a third party should be excluded because it is coerced. It is settled that the accused has no standing to object to a violation of another's Fifth Amendment privilege against self-incrimination." (*People v. Badgett* (1995) 10 Cal.4th 330, 343-344, italics added.) "The basis for the warnings required by *Miranda* is the privilege against self-incrimination [citation], and that privilege is not violated when the information elicited from an unwarned suspect is not used against him." (*People v. Varnum* (1967) 66 Cal.2d 808, 812.)

8

numerous and brief visits to the house, which were consistent with drug sales; and (6) expert testimony that defendants possessed the pills for sale. (See *People v. Bautista* (2014) 223 Cal.App.4th 1096, 1103 ["possession of 50 to 100 days' worth of heroin gives rise to probable cause that defendant possessed the heroin for sale"].) Because Davis's intent to sell the prescription pills was "amply established by independent and uncontradicted evidence, the erroneous admission of [the] challenged statements was harmless beyond a reasonable doubt." (*People v. Elizalde* (2015) 61 Cal.4th 523, 542; *People v. Suff* (2014) 58 Cal.4th 1013, 1080 ["given the other evidence of defendant's guilt, the *Miranda* violation was harmless beyond a reasonable doubt"].)

Moreover, Davis's defense that she possessed over 4,000 prescription pills for her personal use and for a valid medical reason strained credibility, particularly when that defense was supported by the testimony of a doctor whose medical license had been revoked. Additionally, the court instructed the jury to view Davis's statements "with caution" if it determined she had made them, and that Davis could "not be convicted of any crime based on her out-of-court statements alone." We presume the jury followed this instruction. (*People v. Ervine* (2009) 47 Cal.4th 745, 776.) Davis's cursory prejudice argument is not persuasive.

Any assumed error in admitting Davis's statements in violation of *Miranda* was harmless beyond a reasonable doubt. (*People v. Hensley* (2014) 59 Cal.4th 788, 811.)

C.      Any Assumed C*rawford* Error Is Harmless Beyond a Reasonable Doubt

Darrell claims the admission of Davis's statements violated his Sixth Amendment right to confront and cross-examine the witnesses against him under *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford*). "[A]ssuming it was error under *Crawford* . . . to admit [Davis's] statements, . . . such error was harmless beyond a reasonable doubt." (*People v. Jennings* (2010) 50 Cal.4th 616, 652; *People v. Jenkins* (2000) 22 Cal.4th 900, 1015-1016.) Darrell was not present when the police executed the search warrant at Davis's home in 2003, and his name was not on the prescription pill bottles found during the search. Davis mentioned she obtained pills from "various" people; she did not mention or implicate Darrell. The court instructed the jury that Davis's

9

statements did not constitute evidence against Darrell. Additionally, and as discussed above, the evidence overwhelmingly established Darrell's guilt. "In light of the totality of the record . . . we are persuaded beyond a reasonable doubt" that Davis's statements "did not contribute to the verdict . . . . Accordingly, even if we were to assume a confrontation-clause violation occurred with respect to the admission of th[ese] statement[s], reversal of the judgment would not be warranted." (*Jennings,* at p. 654.)

D.　　Defendants' Evidence Code Sections 1101 and 352 Claims Have No Merit

Defendants contend Davis's statements were not admissible under Evidence Code section 1101, subdivision (b), which provides that uncharged misconduct is admissible to prove "the defendant committed the charged offense with the requisite intent if intent is in dispute." (Simons, Cal. Evidence Manual (2017) § 6:12, p. 509 (Simons).)[7] Here, Davis's "plea of not guilty put in issue all of the elements of the offenses, including [her] intent" to sell the controlled substances. (*People v. Balcom* (1994) 7 Cal.4th 414, 422.)

"When intent is in dispute, a sufficiently similar prior act is admissible." (Simons, *supra*, § 6:12, p. 509; *People v. Denis* (1990) 224 Cal.App.3d 563, 568.) The "least degree of similarity (between the uncharged act and the charged offense) is required in order to prove intent." (*Ewoldt, supra*, 7 Cal.4th at p. 402.) Here, the 2003 incident was sufficiently similar to the charged crimes: in both instances, prescription pills were found at Davis's house, along with indicia of drug sales. The court did not abuse its discretion by admitting Davis's statements pursuant to Evidence Code section 1101, subdivision (b).

Davis's statements were not, as defendants argue, more prejudicial than probative under Evidence Code section 352. The prejudice that statute "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative

---

[7]　　Darrell's claim fails because—as we have stated above—the court admitted the statements for the limited purpose of "evaluating whether or not Ms. Davis is guilty or not guilty of the charges" and instructed the jury the evidence was "not to be used in any way in evaluating whether or not [Darrell] is guilty or not guilty of the charges." We reject Darrell's claim—unsupported by a citation to authority or the record—that Davis's statements implicated him.

evidence. '[A]ll evidence which tends to prove guilt is prejudicial or damaging to the defendant's case. . . . The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. . . .' " (*People v. Karis* (1988) 46 Cal.3d 612, 638.) As discussed above, the evidence was relevant, and it did not tend to evoke an emotional bias against Davis. Nor did the alleged remoteness of the statements render them inadmissible under Evidence Code section 352. (See, e.g., *People v. Spector* (2011) 194 Cal.App.4th 1335, 1388 [rejecting argument that prior uncharged conduct "was prejudicial because it was too remote"].)

Defendants' reliance on a trio of cases, including *People v. Spearman* (1979) 25 Cal.3d 107, is not persuasive. The cases concern use of prior convictions for impeachment; here, the prosecution offered Davis's uncharged conduct to prove her intent to sell, not to impeach her. Moreover, at least one court rejected these cases' " 'rigid, black letter rules of exclusion.' " (*People v. Dillingham* (1986) 186 Cal.App.3d 688, 695.) We conclude the admission of evidence of the 2003 incident did not violate Evidence Code section 352.[8]

## II.
### *Admitting the Criminalist's Testimony Did Not Violate State Hearsay Law or the Confrontation Clause*

Relying on *People v. Sanchez* (2016) 63 Cal.4th 665 (*Sanchez*), defendants contend Meldrum's testimony regarding the Ident-A-Drug Web site was inadmissible hearsay and that its admission violated their confrontation rights under the Sixth Amendment to the federal Constitution.[9] In *Sanchez*, the court considered the extent to which *Crawford* "limits an expert witness from relating case-specific hearsay in explaining the basis for an opinion, and it clarified the application of the state hearsay

---

[8]    We have considered and rejected Darrell's contention that the court erred by denying his severance motion.

[9]    The parties filed supplemental briefs discussing the application of *Sanchez* to Meldrum's testimony.

11

rules to that kind of expert testimony." (*People v. Meraz* (2016) 6 Cal.App.5th 1162, 1170, review granted Mar. 22, 2017, S239442.) *Sanchez* held "case-specific out-of-court statements conveyed by the prosecution's gang expert constituted inadmissible hearsay under state law and, to the extent they were testimonial, ran afoul of *Crawford*." (*Ibid.*; *Sanchez, supra,* 63 Cal.4th at p. 686, fn. omitted.)

Under *Sanchez*, "a court addressing the admissibility of out-of-court statements must engage in a two-step analysis. The first step is a traditional hearsay inquiry: Is the statement one made out of court; is it offered to prove the truth of the facts it asserts; and does it fall under a hearsay exception?" If a hearsay statement is being offered by the prosecution in a criminal case, and the *Crawford* limitations of unavailability, as well as cross-examination or forfeiture, are not satisfied, a second analytical step is required. Admission of such a statement violates the right to confrontation if the statement is *testimonial hearsay*." (*Sanchez, supra,* 63 Cal.4th at p. 680.)

A. The Ident-A-Drug Web Site Comes Within the "Published Compilation" Exception to the Hearsay Rule

Defendants contend Meldrum's testimony relating the content of the Ident-A-Drug Web site was hearsay offered to prove its truth, i.e., that the pills were certain pharmaceuticals. The Attorney General argues Meldrum's testimony fell within the "published compilation" exception to the hearsay rule, codified in Evidence Code section 1340. We agree.

Evidence Code section 1340 provides: "Evidence of a statement, other than an opinion, contained in a tabulation, list, directory, register, or other published compilation is not made inadmissible by the hearsay rule if the compilation is generally used and relied upon as accurate in the course of a business as defined in [Evidence Code] Section 1270." (Evid. Code, § 1340.) Examples of "published compilations" include a spray paint can label including hazardous substances (*In re Michael G.* (1993) 19 Cal.App.4th 1674, 1678); survey results measuring magazine advertising (*People ex rel. Lockyer v. R.J. Reynolds Tobacco Co.* (2004) 116 Cal.App.4th 1253, 1258, 1275-1276 (*R.J. Reynolds Tobacco*)); a traffic safety database maintained by the National Highway

12

Traffic Safety Administration (*Collins v. Navistar, Inc*. (2013) 214 Cal.App.4th 1486, 1516 (*Collins*)); and mortality tables showing life expectancy (*Christiansen v. Hollings* (1941) 44 Cal.App.2d 332, 339-340; see generally Simons, *supra,* § 2:94, pp. 187-188.)

The elements of the published compilation exception are: "(1) the proffered statement must be contained in a 'compilation'; (2) the compilation must be 'published'; (3) the compilation must be 'generally used . . . in the course of a business'; (4) it must be 'generally . . . relied upon as accurate' in the course of such business; and (5) the statement must be one of fact rather than opinion." (*People v. Franzen* (2012) 210 Cal.App.4th 1193, 1206, fn. omitted (*Franzen*).) These elements are satisfied here.

First, Ident-A-Drug is a compilation. To compile means " '[t]o collect and put together (materials), so as to form a treatise; to collect into a volume,' and '[t]o make, compose, or construct (a written or printed work) by arrangement of materials collected from various sources.' " (*Franzen, supra,* 210 Cal.App.4th at p. 1210; see also Merriam-Webster's 11th Collegiate Dict. (2014) p. 253 [defining "compile" as "to compose out of materials from other documents," or "to collect and edit into a volume"].) "The history, language, and rationale of [Evidence Code] section 1340 suggest that the exception contemplates an organized, edited presentation of a finite quantity of information that, if not printed on paper, has been recorded and circulated in some fixed form analogous to printing." (*Franzen,* at p. 1209.) The Ident-A-Drug Web site collects information regarding prescription pills from the FDA and pharmaceutical pill manufacturers and presents the information in a searchable database. It is an "organized, edited presentation of a finite quantity of information that . . . has been recorded and circulated in [a] fixed form analogous to printing." (*Franzen,* at p. 1209; *Miller v. Modern Business Center* (1983) 147 Cal.App.3d 632, 635 [page from research corporation's book was a "compilation" under Evidence Code section 1340].) Defendants' argument to the contrary is not persuasive.

Second, the compilation is "published" on the Internet. (*Franzen, supra,* 210 Cal.App.4th at p. 1210 [published means "made public by printing, or an equivalent process" and noting electronically stored data may, in certain circumstances, be treated as

13

a published compilation]; see also *Moreno v. Hanford Sentinel, Inc.* (2009) 172 Cal.App.4th 1125, 1130 [plaintiff "published" the information by posting it on a Web site].) Third, the compilation is "generally used" in the crime lab's course of business. Meldrum testified she used Ident-A-Drug over 2,000 times to presumptively identify prescription pills, and that the use of the Ident-A-Drug Web site is generally accepted in the scientific community. (See *Collins, supra,* 214 Cal.App.4th at p. 1516 [expert testified "databases were . . . commonly used and relied upon by traffic safety experts and statisticians"].)

Lastly, the Ident-A-Drug Web site is "generally . . . relied upon as accurate" by the crime lab in conducting its business. (Evid. Code, § 1340.) Meldrum's testimony that she used Ident-A-Drug over 2,000 times to presumptively identify prescription pills supports an inference the crime lab relies on the Web site's accuracy. Meldrum also testified the use of Ident-A-Dent to presumptively identify prescription drugs is generally accepted in the scientific community. Furthermore, Ident-A-Drug has a commercial incentive to be accurate and reliable because subscribers pay to access the Web site. Here, "[t]rustworthiness is reasonably assured by the fact that the business community generally uses and relies upon the compilation and by the fact that its author knows the work will have no commercial value unless it is accurate." (*Miller v. Modern Business Center, supra,* 147 Cal.App.3d at p. 635; *In re Michael G., supra,* 19 Cal.App.4th at p. 1678 [public relies on accuracy of label including hazardous substance]; *R.J. Reynolds Tobacco, supra,* 116 Cal.App.4th at pp. 1278-1279 [survey results were "relied on as accurate in the course of business"].)

Relying on *Franzen*, defendants contend Ident-A-Drug is not a published compilation under Evidence Code section 1340. In *Franzen*, a law enforcement officer received a telephone call and wanted to match the phone number to the caller. The officer " 'ran that phone number in "Entersect", an online database, and the database listed that cell phone number as belonging to' " the defendant. (*Franzen, supra,* 201 Cal.App.4th at p. 1204.) The appellate court determined the database from which the officer "extracted the evidence" bore "virtually no resemblance to a 'published

14

compilation' " in Evidence Code section 1340 and held the "mere retrieval of [ ] information from a website cannot transform it into proof worthy of presentation to a jury." (*Franzen,* at pp. 1210, 1215.)

*Franzen* explained: "apart from consisting of a collection of information, [the database] has none of the characteristics of a 'compilation' in the modern sense. [¶] To treat a database as a published compilation merely because it is accessible through a website would dramatically undermine the delicate balance of competing policies reflected in the hearsay rule, its exceptions, and the particular exception here. . . . [T]he Internet, provides ready access to information of all shades and degrees of accuracy, from the indisputably true to the inarguably false. Of particular concern in a setting like the present one is the persistence in the digital universe of outdated information. A person's real-world link with a telephone number may be broken when she moves or changes carriers. . . . We suspect that methods exist for weeding out such obsolete data and thus increasing the accuracy of the data retrieved, but there was no evidence to this effect here. On the contrary, the evidence was that the site reported 'whatever information that's out there within the internet that [a phone number] might be assigned to.' " (*Franzen, supra,* 210 Cal.App.4th at pp. 1210-1212, fns. omitted.)

In our view, *Franzen* is easily distinguishable. There, the information in the database was available to anyone with an Internet connection and the source of the information was unknown and potentially inaccurate. (*Franzen, supra,* 210 Cal.App.4th at pp. 1209, 1211.) Here, Ident-A-Drug is a subscription-based and login-controlled Web site, and the information on the Web site comes from the FDA and prescription pill manufacturers. Ident-A-Drug does not, as in *Franzen,* report " 'whatever information that's out there within the internet.' " (*Id.* at p. 1212.) Instead, the Web site reports a finite amount of information from a governmental agency and from the manufacturers of the prescription drugs listed. The concerns articulated in *Franzen*—that an Internet database may contain outdated or inaccurate information—are not present here.

In *Franzen*, there was "a complete failure of proof with respect to the use and reliance components of the cited exception." (*Franzen, supra*, 210 Cal.App.4th at

15

p. 1214.) The officer was not "asked to explain what use he made of it, or what use the department or other 'businesses' had made of similar information in the past. He was not asked to, and did not, affirm that he relied on the site 'as accurate.' Indeed there was no evidence that the information contributed to his investigation of the case in any way. For all the record shows, the only use he ever made of the information retrieved from the site was to copy it into his police report and then repeat it in court." (*Ibid.*) Here, there was no "failure of proof"—Meldrum testified regarding her training on, and use of, the Web site. She also testified that using Ident-A-Drug to presumptively identify prescription pills was generally accepted in the scientific community. Finally, and in contrast to the police officer in *Franzen*, Meldrum relied on the information on the Web site to presumptively identify the pills.

Defendants' reliance on *People v. Stamps* (2016) 3 Cal.App.5th 988 (*Stamps*) is unavailing. In that case, a criminalist presumptively identified prescription pills using Ident-A-Drug, but did not explain the Web site in any detail, nor testify that any special expertise was required to use it. (*Id.* at pp. 991, 992, fn. 2.) On appeal, the Attorney General conceded the content of the Ident-A-Drug Web site was hearsay and "proposed no hearsay exception." (*Id.* at pp. 996, 997 & fn. 7.) In a footnote, a division of this court expressed concern regarding the reliability of Internet Web sites but took "no position" on whether the Ident-A-Drug content fell within the published compilation exception to the hearsay rule. (*Id.* at p. 997, fn. 7.) *Stamps* does not assist defendants, because it did not consider whether a published drug reference guide accessible through a subscription Internet service is a published compilation within the meaning of Evidence Code section 1340. "It is axiomatic that an opinion does not stand for a proposition the court did not consider." (*People v. Taylor* (2010) 48 Cal.4th 574, 626.)

Nor are we persuaded by defendants' reliance on cases from other jurisdictions, including *People v. Hard* (Colo.Ct.App. 2014) 342 P.3d 572 (*Hard*). In *Hard*, a state trooper found pills in the defendant's pants pocket and "accessed the website Drugs.com to identify" them. (*Id.* at p. 575.) On appeal, the defendant argued the state trooper's testimony regarding Drugs.com was inadmissible hearsay, and the Colorado Court of

16

Appeals agreed. (*Ibid.*) It determined Drugs.com was not a market report or commercial publication within the meaning of Colorado Rules of Evidence 803(17), which codifies an exception to the hearsay rule for " 'Market quotations, tabulations, lists, directories or other published compilations, generally used and relied upon by the public or persons in particular occupations.' " (*Hard,* at p. 576.) In reaching this conclusion, *Hard* considered the "necessity and reliability" of the Web site. (*Id.* at p. 577.)

First, the *Hard* court noted the prosecution did not argue "using Drugs.com [was] a necessary means of identifying drugs." Next, the court concluded the prosecution failed to establish the information on the Web site was "sufficiently reliable for the purpose of identifying a controlled substance." (*Hard, supra,* 342 P.3d at p. 577.) *Hard* determined the testimony that Drugs.com was " 'nationally recognized' " and relied on to identify pills lacked foundation and failed to establish the Web site's reliability. (*Id.* at pp. 577-578.) Additionally, *Hard* noted the prosecution provided no support for the argument that "Drugs.com is reliable because that website compiles and publishes material from reliable sources." (*Id.* at p. 578.)

*Hard* has no application here. In *Hard*, the prosecution failed to prove the Web site was necessary or reliable. Meldrum's testimony established the necessity, reliability, and trustworthiness of the information on the Ident-A-Drug Web site. We conclude the Ident-A-Drug Web site comes within the published compilation exception to the hearsay rule codified in Evidence Code section 1340.

B.      There Was No Confrontation Clause Violation Because the Challenged Hearsay Is Not Testimonial

The second prong of the *Sanchez* analysis asks: "If an out-of-court statement is hearsay because it is being offered for the truth of the facts it asserts, is that statement testimonial hearsay?" (*Sanchez, supra,* 63 Cal.4th at p. 687; see also *People v. Ochoa* (2017) 7 Cal.App.5th 575, 583.) In *Sanchez*, our high court "surveyed the substantial body of case law regarding the proper formulation of 'testimonial' and summarized the concept as follows: 'Testimonial statements are those made primarily to memorialize facts relating to past criminal activity, which could be used like trial testimony.

17

Nontestimonial statements are those whose primary purpose is to deal with an ongoing emergency or some other purpose unrelated to preserving facts for later use at trial.' [Citation.] Also, in order to be considered testimonial, 'the statement must be made with some degree of formality or solemnity.' " (*Ochoa,* at p. 583.)

Examples of testimonial statements include " '*ex parte* in-court testimony or its functional equivalent—that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially,' [citation]; 'extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions,' [citation]; 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.' " (*Crawford, supra,* 541 U.S. at pp. 51-52.)

Here the challenged hearsay is not testimonial. As described above, Ident-A-Drug contains generic data about pharmaceutical pills, based on information provided from pharmaceutical manufacturers and the FDA. The primary purpose of collecting and compiling this content on the Ident-A-Drug Web site was not to gather or preserve evidence for a criminal prosecution. (See *People v. Dungo* (2012) 55 Cal.4th 608, 621; see also *Stamps, supra,* 3 Cal.App.5th at p. 995, fn. 5 [content of Ident-A-Drug Web site was not testimonial].)[10] Additionally, and as defendants seem to concede, the information on Ident-A-Drug does not have the requisite level of formality or solemnity to constitute testimonial hearsay. (See, e.g., *People v. Holmes* (2012) 212 Cal.App.4th

---

[10]    *Melendez-Diaz v. Massachusetts* (2009) 557 U.S. 305 (*Melendez-Diaz*) explained: " 'Most of the hearsay exceptions covered statements that by their nature were not testimonial—for example, business records or statements in furtherance of a conspiracy.' [Citation.] Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because—having been created for the administration of an entity's affairs and not for the purpose of establishing or proving some fact at trial—they are not testimonial." (*Id.* at p. 324.)

18

431, 438 ["[u]nsworn statements that 'merely record objective facts' are not sufficiently formal to be testimonial"].)

Defendants' reliance on *Melendez-Diaz, supra,* 557 U.S. 305 and *Bullcoming v. New Mexico* (2011) 564 U.S. 647 (*Bullcoming*), does not alter our conclusion.  In *Melendez-Diaz,* crime lab analysts prepared documents certifying that a sample of material recovered from the defendant was tested and determined to contain an illegal drug.  The certificates were sworn to before a notary public, as required by state law, and admitted at trial in lieu of the analysts' testimony.  (*Melendez-Diaz*, at pp. 308-309.)  The United States Supreme Court determined the certificates were "affidavits" and that under *Crawford*, the "affidavits were testimonial."  (*Id.* at pp. 310, 311.)

In *Bullcoming*, an analyst tested the blood sample of an alleged drunk driver and prepared a lab report attesting he performed the test using normal protocol.  The analyst signed the report, which was admitted into evidence through a surrogate analyst "who was familiar with the laboratory's testing procedures, but had neither participated in nor observed the test on [the] blood sample."  (*Bullcoming, supra,* 564 U.S. at p. 651.)  The United States Supreme Court concluded the report was testimonial and explained that even though the report was not a formal affidavit, as in *Melendez-Diaz*, it was a sufficiently formal and official document "created solely for an 'evidentiary purpose,' . . . made in aid of a police investigation, [and so] ranks as testimonial."  (*Id.* at p. 664.)

Here, Meldrum testified about the presumptive identification she conducted, and defense counsel cross-examined her.  Meldrum prepared a report of the results, but the report was not introduced into evidence.  Meldrum's testimony bears no resemblance to the certified documents in *Melendez-Diaz*, nor to the lab report in *Bullcoming*.  We conclude there was no confrontation clause violation.  Having reached this result, we need not address the parties' arguments regarding prejudice.

## III.

*With the Exception of Count One, the Prosecution Established Defendants Possessed Controlled Substances*

Defendants argue the prosecution did not prove beyond a reasonable doubt the pills were controlled substances.

### A. Chemical Testing Was Not Necessary to Establish Defendants Possessed Controlled Substances

First, defendants contend insufficient evidence supports the convictions because the pills were not chemically tested. Sections 11351 and 11375 prohibit possession of a controlled substance for sale. To establish a violation of these statutes, "the prosecution must prove beyond a reasonable doubt that (1) the defendant exercised dominion and control over the controlled substance, (2) the defendant was aware that he or she was in possession of a controlled substance, (3) the defendant was aware of the nature of a controlled substance, (4) the controlled substance was in an amount sufficient to be used for sale or consumption as a controlled substance, and (5) the defendant possessed a controlled substance with the specific intent to sell it." (*People v. Parra* (1999) 70 Cal.App.4th 222, 225-226; see also CALCRIM No. 2302.) " 'In reviewing a sufficiency of evidence challenge, we view the evidence in the light most favorable to the verdict and determine whether *any* rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.' " (*People v. Davis* (2013) 57 Cal.4th 353, 357 (*Davis*).)

As defendants acknowledge, chemical analysis is not required to establish the identity of a controlled substance. The essential elements of possession of a controlled substance " 'may be established circumstantially.' " (See *People v. Palaschak* (1995) 9 Cal.4th 1236, 1242.) Chemical test results are routinely introduced at trial to establish the illegal nature of a controlled substance, but they are not required. "[T]he nature of a substance, like any other fact in a criminal case, may be proved by circumstantial evidence. [Citations.] It may be proved, for example, by evidence that the substance was a part of a larger quantity which was chemically analyzed [citations], by the expert opinion of the arresting officer [citation], and by the conduct of the defendant indicating

20

consciousness of guilt." (*People v. Sonleitner* (1986) 183 Cal.App.3d 364, 369; see also *Davis*, *supra,* 57 Cal.4th at p. 357 [citing cases where expert testimony on MDMA's "chemical composition" or its "effects on the user" were used to establish possession of a controlled substance]; *People v. Marinos* (1968) 260 Cal.App.2d 735, 738 [affirming marijuana possession conviction premised on the arresting officer's testimony].)

Here, Meldrum presumptively identified the prescription pills and testified she did not believe the pills were counterfeit. Dr. Manougian prescribed defendants numerous prescription pills including Vicodin, OxyContin, and Valium. Thousands of pills—some of which were in prescription pill bottles with labels bearing defendants' names—were found in the residence. In light of this evidence, chemical testimony was not necessary to prove defendants possessed the controlled substances.[11]

*People v. McChristian* (1966) 245 Cal.App.2d 891 is distinguishable. There, a police officer saw balloons inside of the defendant's mouth; believing they contained heroin, the officer unsuccessfully tried to recover the balloons as the defendant fled. (*Id.* at pp. 894-895.) The balloons were never recovered or entered into evidence. (*Id.* at pp. 896-897.) Here, the narcotics were recovered, entered into evidence, and inspected by Meldrum, an expert in drug identification.

---

[11]     Courts in other jurisdictions have reached similar results. (*U.S. v. Schrock* (6th Cir. 1988) 855 F.2d 327, 334 [federal courts do not require "scientific identification of a substance [a]s an absolute prerequisite to conviction for a drug-related offense"]; *U.S. v. Walters* (1st Cir. 1990) 904 F.2d 765, 770 [same]; *Jones v. Com.* (Ky. 2011) 331 S.W.3d 249, 254-255) [sufficient evidence supported  conviction for trafficking in a controlled substance, in part because two "fully-qualified" chemists "visually identified" the drug by relating that "based upon the shape, color, and markings, the drug visually appeared to be alprazolam"]; *State v. Carter* (La.Ct.App. 2008) 981 So.2d 734, 744 [expert in forensic chemistry identified the "green pills" as containing hydrocodone by performing a "visual inspection and comparison with pictures in a book"]; *State v. Stank* (Wis.Ct.App. 2005) 708 N.W.2d 43, 54-55 [forensic scientist identified a pill as OxyContin by, among other things, using Physician's Desk Reference]; *Sterling v. State* (Tex.Ct.App. 1990) 791 S.W.2d 274, 277 [pharmacist testified tablets were diazepam based on their appearance and markings].)

B.    Sufficient Evidence Demonstrates Defendants Possessed Methadone and Morphine

Defendants claim insufficient evidence supports the methadone and morphine convictions (Counts Four and Five, respectively) because there was no evidence "connecting" them to methadone and morphine, and because these pharmaceuticals were "attributable" to Mooring, Sr.  We are not persuaded.  Methadone and morphine were found at Davis and Mooring, Sr.'s home.  This evidence is sufficient to establish Davis had constructive possession.  (*People v. Busch* (2010) 187 Cal.App.4th 150, 162 [constructive possession may be shown by circumstantial evidence; inference of dominion and control easily established when the contraband is found in the defendant's residence]; *People v. Saldana* (1984) 157 Cal.App.3d 443, 455 [constructive possession of drugs shown where defendant jointly occupied bedroom where drugs were found].)  Darrell came to the residence when it was being searched, received a property receipt for the seized items, and later went to the police station to retrieve "his pills."  Pill bottles linked Darrell to the residence; one pill bottle containing methadone was prescribed to "Mooring, Darrell."  Simmons testified defendants possessed the pharmaceuticals for sale.  Together, this evidence demonstrates Darrell had constructive possession of methadone and morphine.  That some of the pills may have been prescribed to Darrell's father does not demonstrate defendants did not possess them.  Defendants' arguments that Simmons offered "improper expert opinion" and testified to an incomplete hypothetical are not persuasive.

C.    The Prosecution Did Not Establish Dihydrocodeinone/Vicodin Is a Controlled Substance Under Sections 11055 or 11056

Defendants argue Count One must be reversed because the prosecution failed to establish dihydrocodeinone/Vicodin is a controlled substance.  We agree.

As relevant here, section 11351 makes it a felony to possess for sale the controlled substances "specified in subdivision (b) or (c) of Section 11055" or in "in subdivision (h)

22

of Section 11056."[12]  The Attorney General concedes dihydrocodeinone is not listed in Section 11055, subdivisions (b) or (c) or section 11056, subdivision (h).  The Attorney General, however, argues dihydrocodeinone is "the same controlled substance" as hydrocodone, which *is* listed in section 11055, subdivision (b).  (See § 11053 [the "controlled substances listed . . . in the schedules . . . are included by whatever official, common, usual, chemical, or trade name designated"].)  To support this argument, the Attorney General notes certain witnesses referred to dihydrocodeinone as hydrocodone, and that Dr. Manougian prescribed defendants hydrocodone.  According to the Attorney General, "the jury had a rational basis to infer that dihydrocodeinone was a controlled substance."  We are not persuaded.

Our high court's decision in *Davis, supra,* 57 Cal.4th 353 is instructive.  In that case, the defendant was charged with possession of 3,4-methylenedioxymethamphetamine (MDMA), a substance not specifically listed as a controlled substance.  (*Id.* at pp. 356, 358.)  The jury was only given the scientific name of MDMA and was not presented with expert testimony as to whether MDMA met the definition of a controlled substance or analog.  (*Id.* at pp. 360, 359.)  On appeal, the defendant argued there was insufficient evidence that MDMA was a controlled substance.

The California Supreme Court agreed.  First, it noted "the jury may find that MDMA is a controlled substance or analog based on *evidence* of MDMA's chemical composition or its effects on the user.  Here, . . . the record contains neither a stipulation nor testimony establishing that MDMA meets the definition of a controlled substance or analog." (*Davis, supra,* 57 Cal.4th at p. 359.)  The *Davis* court continued, "While the Court of Appeal, having referred to outside sources, satisfied itself that the pills in question qualified as a controlled substance, those sources were not before the jury. [Citation.]  All the jury had before it was a chemical name not listed in any schedule of the code.  An appellate court cannot take judicial notice of additional facts the

---

[12]  Defendants' challenge to their conviction for possessing codeine (Count Three) fails because section 11055 subdivision (b)(1)(G) lists codeine as a controlled substance, and Meldrum presumptively identified 113 pills as "codeine."

23

prosecution failed to prove at trial to affirm a conviction." (*Id.* at p. 360.) The court also rejected the argument that the jury could rely on common knowledge or common sense that MDMA contained methamphetamine because it was included in the scientific name. (*Ibid.*)

*Davis* ultimately concluded: "Because it is not specifically listed in any schedule, evidence of MDMA's chemical name, standing alone, is insufficient to prove that it contains a controlled substance or meets the definition of an analog. '[T]he matter in issue is . . . not within the common knowledge of laymen.' [Citation.] Thus, it was incumbent on the People to introduce competent evidence or a stipulation about MDMA's chemical structure or effects. Without such evidence, there was no rational basis for a jury of laypersons to infer that 3,4-methylenedioxymethamphetamine contains methamphetamine or amphetamine, or that it has a substantially similar chemical structure or effect to methamphetamine or amphetamine." (*Davis, supra,* 57 Cal.4th at pp. 361-362, fn. omitted.)

Here, defendants were charged with possessing "Dihydrocodeinone, a controlled substance," for sale. The jury was told dihydrocodeinone would be referred to as Vicodin, and it convicted defendants of possessing "dihydrocodeinone/Vicodin" for sale. Neither dihydrocodeinone nor Vicodin are listed as controlled substances in sections 11055 or 11056. As in *Davis*, "[a]ll the jury had before it was a chemical name not listed in any schedule of the code." (*Davis, supra,* 57 Cal.4th at p. 360.) Defendants were not charged with, or convicted of, possessing hydrocodone for sale and the prosecution did not prove dihydrocodeinone is hydrocodone. "In short, 'the prosecution simply failed to close a[n] . . . evidentiary gap mandated by the terms of the statute . . . allegedly violated.' [Citation.] Because it is not specifically listed" in sections 11055 or 11056, evidence that defendants possessed dihydrocodeinone/Vicodin is insufficient to establish

24

they possessed a controlled substance in violation of section 11351. " '[T]he matter in issue is . . . not within the common knowledge of laymen.' " (*Davis,* at p. 361.)[13]

Defendant's conviction for possessing dihydrocodeinone/Valium for sale (§ 11351, Count One) must be reversed, and the cause remanded for resentencing.

## IV.
### *The Court Did Not Err in Imposing the Section 11370.2 Sentence Enhancement*

Darrell contends the court improperly imposed a sentence enhancement (§ 11370.2, subd. (a)) on one of his prior drug-related convictions.

The indictment alleged Darrell was convicted in 1992 of two drug offenses within the meaning of section 11370.2, subdivision (a): possession of cocaine for sale (§ 11351); and sale or transportation of cocaine (§ 11352). The prosecution proved these convictions with a certified information and abstract of judgment. The trial court found the prior convictions true, and sentenced Darrell to 10 years in prison, comprised of a four-year term on Count One and two three-year terms on the section 11370.2, subdivision (a) enhancements.

As relevant here, section 11370.2, subdivision (a) requires the court to impose a three-year enhancement for a prior conviction of section 11352. Before 2014, section 11352 made it a felony to transport a controlled substance. (Stats. 2011, ch. 15, § 154, p. 320.) Effective January 1, 2014, section 11352 was amended to add subdivision (c), which states, "For purposes of this section, 'transports' means to transport for sale." (Stats. 2013, ch. 504, § 1, pp. 4287-4288.) Transportation of a controlled substance for personal use does not violate section 11352.

---

[13]   Section 11351 also prohibits the possession of Schedule III drugs for sale. Schedule III drugs are listed in Section 11056. Section 11056, subdivision (e) prohibits the possession of dihydrocodeinone when contained in a compound or mixture with other substances in certain specified proportions. (§ 11056, subd. (e)(1)-(4).) Meldrum testified dihydrocodeinone is a Schedule III drug, but she did not offer any evidence regarding the weight of dihydrocodeinone or whether it was combined with other substances as required by section 11056.

According to Darrell, the "law no longer supports application of a [section] 11370.2 enhancement to a pre-2014 transportation offense that did not include . . . the requirement that the transportation be for purposes of sale." Citing *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), Darrell claims he is "entitled to retroactive benefit" of the amendment to section 11352. We disagree.[14] Absent a saving clause providing for prospective application, an amendment mitigating the punishment for a criminal act "can be applied constitutionally to acts committed before its passage provided the judgment convicting the defendant of the act is not final." (*Estrada,* at pp. 744-745.) A judgment becomes final when the availability of an appeal is exhausted and the time for filing a petition for a writ of certiorari has elapsed. (*People v. Kemp* (1974) 10 Cal.3d 611, 614.)

Here, Darrell's 1992 conviction was final well before section 11352 was amended. (*Estrada, supra,* 63 Cal.2d at p. 745.) Darrell's claim to the contrary—without analysis or citation to supporting authority—is not persuasive. Because Darrell's conviction was final before the Legislature amended section 11352, the trial court did not err by imposing a sentence enhancement premised on that conviction. (*Lopez, supra,* 6 Cal.App.5th at pp. 503-504.) Darrell's reliance on language from the author of the 2013 legislation does not alter our conclusion.

V.
*The Court Did Not Abuse Its Discretion in Denying*
*Darrell's Romero Motion*

Darrell challenges the denial of his *Romero* motion. After the court found true Darrell's prior drug conviction enhancement allegations, he moved to strike the prior convictions pursuant to Penal Code section 1385 and *Romero*. He argued: (1) the prior convictions were "over twenty years" old and he had successfully completed parole; and (2) the current convictions were not serious or violent felonies. Darrell noted several mitigating factors, including a 1999 shooting which rendered him unable to walk and

---

[14] This issue is currently before the Supreme Court. (*People v. Maita* (Oct. 19, 2015, C074872 [nonpub. opn.]), review granted February 17, 2016, S230957; *People v. Lopez*, (2016) 6 Cal.App.5th 494, review granted March 22, 2017, S239567 (*Lopez*); Cal. Rules of Court, rule 8.1105(e)(1)(B).)

26

caused him chronic pain. The People opposed the motion. After considering the issue "long and hard," the court denied the motion, concluding Darrell was "not outside the spirit, the scheme of strikes sentencing" based on the "seriousness of th[e] offense," the "volume of narcotics that were involved," and Darrell's prior convictions. The court imposed sentence enhancements on the prior convictions (§ 11370.2, subd. (a)).

Darrell claims the court abused its discretion in denying the *Romero* motion because his prior convictions were remote. This perfunctory claim is not persuasive. Darrell has not established the court erred by denying his motion to strike the prior convictions. (*People v. Carmony* (2004) 33 Cal.4th 367, 374.) The "record clearly shows the court was aware of its discretion, aware of the applicable factors a court must consider in dismissing a prior strike, and appropriately applied the factors." (*People v. Philpot* (2004) 122 Cal.App.4th 893, 906.) The court's conclusion that Darrell was not outside the spirit of the Three Strikes scheme based on his criminal history and the circumstances of the current offenses—which included over 4,000 prescription pills— was not an abuse of discretion. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.) The prior convictions were not so remote that they compelled granting the *Romero* motion. (See, e.g., *People v. Solis* (2015) 232 Cal.App.4th 1108, 1124 [no abuse of discretion denying motion to dismiss 30-year-old strike]; *People v. Humphrey* (1997) 58 Cal.App.4th 809, 813 [by itself, remoteness of prior strike is insufficient to grant a *Romero* motion].)

Finally, we reject Darrell's claim that the court erred by imposing the enhancement because the prior convictions arose out of the same set of operative facts under Penal Code section 654.[15]

---

[15] The Attorney General contends "the abstract of judgment incorrectly states that the trial court imposed three two-year sentences for three section 11370.2, subdivision (a) enhancement allegations." We disagree. The abstract of judgment indicates the court imposed *two* section 11370.2, subdivision (a) enhancements, for a total of 6 years. The abstract of judgment is consistent with the court's oral pronouncement of judgment, wherein the court stated: "For the [section] 11370.2(a) allegations . . . two three year enhancements."

27

DISPOSITION

Defendants' conviction for possession of dihydrocodeinone/Vicodin (§ 11351, Count One) is reversed, and the cause is remanded for resentencing. In all other respects, the judgment is affirmed.

_____

Jones, P. J.


We concur:


_____

Needham, J.


_____

Bruiniers, J.


A143470

The People, v. Darrell Ellis Mooring, Jr., et al. (A143470)


Trial Court:    Contra Costa County Superior Court

Trial Judge:    Hon. Barbara Ann Zuniga

Counsel:

Laureen A. Bethards and Carmela A. Caramagno, by appointments of the Court of Appeal under the First District Appellate Project's independent case system for Defendant and Appellant Darrell Ellis Mooring, Jr.

Walter K. Pyle, by appointment of the Court of Appeal under the First District Appellate Project's independent case system for Defendant and Appellant Lanita Davis.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Jeffrey M. Laurence, Senior Assistant Attorney General, Catherine A. Rivlin, Supervising Deputy Attorney General, Ann P. Wathen, Deputy Attorney General, for Plaintiff and Respondent.


A143470